**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| HITHAM ABUHOURAN, | : | |
| | : | |
| Petitioner, | : | |
| | : | Civ. No. 08-4379 (DRD) |
| v. | : | |
| | : | |
| WARDEN J. GRONDOLSKY, | : | |
| | : | |
| Respondent. | : | |
| | : | |
| AKTHAM ABUHOURAN, | : | |
| | : | |
| Petitioner, | : | |
| | : | |
| v. | : | Civ. No. 08-4838 (DRD) |
| | : | |
| CHRISTOPHER MELLONEY, | : | |
| | : | |
| Respondent | : | |
| | : | **O P I N I O N** |
| | : | |

*Appearances by:*
Donald J. McCauley, Esq.
Office of the Public Defender
972 Broad Street
Newark, NJ   07102

> *Attorney for Petitioner Hitham Abuhouran*

Bruce S. Rosen, Esq.
McCusker, Anselmi, Rosen, and Carvelli
210 Park Avenue, Suite 301
PO Box 240
Florham Park, NJ 07932

> *Attorney for Petitioner Aktham Abuhouran*

Laurie Magid
Acting United States Attorney
Eastern District of Pennsylvania
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106-4476
By:  Robert A. Zauzmer
Assistant United States Attorney

*Attorney for Respondents Warden*
*J. Grondolsky and Christopher Melloney*

**Debevoise, Senior District Judge**

In these two cases Petitioners seek relief pursuant to 28 U.S.C. § 2241, asserting that they are actually innocent of the money laundering charges of which they were convicted, and that they are entitled to vacatur of those convictions in light of the Supreme Court's decision in United States v. Santos, 128 S. Ct. 2020 (2008).  The Petitioners are Hitham Abuhouran (Steve Houran) and Aktham Abuhouran (Tony Houran).  Associated with them in their criminal transactions was their brother Adham Abuhouran (Adam Houran), who is now a fugitive.  This case presents the question whether the money derived from the multiple bank frauds of which Petitioners and their confederates were guilty were "profits" of the bank frauds and thus "proceeds of some form of unlawful activity" within the intent of § 1956(a)(1) of the money laundering statute.

## I.  Procedural Background

A.  Steve Houran:  In 1992, the Bank of the Brandywine Valley ("BBV") failed as a result of thefts of more than $9 million engineered by a consortium of individuals including the three Houran brothers, led by Steve Houran.  On October 3, 1995, Steve Houran, Tony Houran and

five others were named in a 57-count indictment in the United States District Court for the Eastern District of Pennsylvania.

Steve Houran was charged with 27 counts, including one count of engaging in a continuing financial crimes enterprise, 18 U.S.C. § 225; 15 counts of bank fraud, in violation of 18 U.S.C. § 1344; four counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1); two counts of interstate transportation of stolen property, in violation of 18 U.S.C. § 2314; one count of conspiracy to commit perjury and to make false statements to a bank, in violation of 18 U.S.C. § 371; one count of conspiracy to commit money laundering and to transport stolen property in interstate commerce, in violation of 18 U.S.C. § 371; two counts of perjury, in violation of 18 U.S.C. § 1623; and a forfeiture claim, based on 18 U.S.C. § 982.  On September 10, 1996, when his trial was scheduled to begin, Steve Houran entered a guilty plea to all charges against him.

Upon entering his guilty plea in September 1996, Steve Houran announced an intention to cooperate with the government in the investigation of others, and the government stipulated in the plea agreement that it would consider that cooperation in deciding whether to file a motion pursuant to § 5K.l of the Sentencing Guidelines allowing a downward departure at sentencing. Steve Houran immediately began to provide information which he said concerned significant matters of national security, such as international terrorism.

While purporting to cooperate, however, Steve Houran was also continuing to surreptitiously engage in new financial frauds.  He was continuing to secure fraudulent real estate loans in the names of sham borrowers from other institutions.  The additional thefts through such fraud during the 18 months that Steve Houran was on bail in the federal case amounted to more than $500,000.

3

In addition, beginning in 1996, Steve Houran and his brothers developed a new scheme of credit card fraud which resulted in the theft of additional hundreds of thousands of dollars from credit card issuers.

In 1997, having amassed substantial evidence of the new frauds, the government filed an ex parte motion to revoke the bail of Steve Houran and his two brothers.  The Pennsylvania District Court then held a three-day hearing at which the government presented evidence of the crimes committed by the Hourans while on bail.  At the conclusion of that hearing, on May 14, 1997, the court ordered that Steve Houran be detained, and that his brothers be released to home detention subject to electronic monitoring.

Because of Steve Houran's criminal conduct while on bail, and other false statements he made to government representatives while he was purportedly  "cooperating," the government announced that it considered Houran to be in breach of his plea agreement and stated that it would not file a departure motion on his behalf under Section 5K1.1 of the Guidelines.  The government deemed the "cooperation" to be largely false and essentially a diversionary action to conceal the ongoing crimes in 1996-1997.

On August 19, 1997, Steve Houran was sentenced by United States District Judge Louis H. Pollak to a within-Guidelines term of imprisonment of 188 months, a term of supervised release of five years, a special assessment of $1,350, restitution in the amount of $6,917,246.10, and an order of forfeiture.

On November 19, 1998, the Court of Appeals affirmed the sentence.  See United States v. Abuhouran, 161 F.3d 206 (3d Cir. 1998).  Steve Houran petitioned for certiorari, which was denied by the Supreme Court on April 19, 1999.  See Abuhouran v. United States, 526 U.S. 1077

(1991).

Steve Houran has since filed numerous post-conviction petitions in the District Court in the Eastern District of Pennsylvania and the Court of Appeals.  All of his various petitions were denied.  These petitions included two captioned under Section 2255, both of which were denied by the District Court.  In addition, the Court of Appeals has three times rejected Steve Houran's motions for permission to file second or successive petitions.

After the August 19, 1997, sentencing, the Government continued its investigation of the new frauds which had occurred during the investigation and prosecution of the original case.  The result was another indictment in the Eastern District of Pennsylvania, returned in 2001 against 12 persons, including Steve Houran.  In that case,  No. 01-629-01, he pled guilty to an additional charge of conspiracy, and, by stipulation, was sentenced to a term of imprisonment of 60 months, with 24 months to run consecutively to the earlier imposed 188-month sentence.  At present, the projected release date following the completion of both of the sentences is September 13, 2012.

On June 2, 2008, the Supreme Court issued its decision in Santos.  In a divided decision which produced no majority opinion, the Court held that the term "proceeds" in the money laundering statute, as applied to the proceeds of an illegal gambling operation in violation of 18 U.S.C. § 1955, refers to "profits" of the offense and not simply "receipts."  Santos, 128 S. Ct. at 2025.  Steve Houran immediately sought to challenge his conviction for four counts of money laundering on the basis of that decision, asking permission to file a successive 2255 petition.  On October 3, 2008, the Court of Appeals denied his request, for the reason that Santos did not set forth a new rule of constitutional law retroactively applicable to cases on collateral review, and thus his case did not fall within the narrow grounds allowed for a successive 2255 petition.  The

Government acknowledges, however, that Steve Houran may proceed under 28 U.S.C. § 2241 in the unusual circumstances of this case.  See In re Dorsainvil, 119 F.3d 245, 251 (3d Cir. 1997) (denying for lack of "newly discovered" evidence petitioner's request to file a successive 2255 petition based on new Supreme Court precedent, but stating that relief under section 2241 is available in such circumstances).

B.  Tony Houran: Tony Houran was one of the seven defendants named in the 57-count indictment.  In September 1996, he proceeded to trial along with his brother and co-defendant Adam Houran.

At the conclusion of the six-week trial, Tony Houran was convicted of four counts of bank fraud in violation of 18 U.S.C. § 1344; one count of money laundering in violation of 18 U.S.C. § 1956(a)(1); two counts of conspiracy in violation of 18 U.S.C. § 371; and one count of forfeiture pursuant to 18 U.S.C. § 982.  He won a judgment of acquittal, pursuant to Rule 29 of the Federal Rules of Criminal Procedure, on one count of perjury, and was acquitted by the jury on one count of interstate transportation of stolen property.  (Adam Houran was convicted by the jury of all charges against him.)

Tony Houran was sentenced by Judge Pollak on August 22, 1997, to a term of imprisonment of 109 months, a term of supervised release of five years, restitution in the amount of $1,860,477.44, and a special assessment of $350.  Tony Houran appealed on a variety of issues.  The Court of Appeals affirmed the conviction and sentence.  See United States v. Abuhouran, 162 F.3d 230 (3d Cir. 1998).

Relevant to Tony Houran's § 2241 petition are events that followed his conviction.   Both Tony and Adam Houran joined Steve Houran's purported effort at cooperation.  As part of their

effort to obtain leniency at sentencing, they met regularly with F.B.I. agents and other government agents beginning in September 1996 and engaged in monitored meetings with subjects under investigation.

During the course of these efforts, the three brothers engaged in substantial financial frauds, as described above. Obtaining evidence of the new fraud, the Government moved to revoke the bail of the three brothers.  After a hearing, the Court on May 14, 1997 ordered that Steve Houran be detained and that Adam and Tony Houran be released to house detention subject to electronic monitoring.  Adam and Tony Houran entered upon another scheme.  They deposited counterfeit checks totaling approximately $2.5 million in six banks and tried to persuade the banks to wire the funds to accounts in Jordan.  On August 14, 1997, after making these arrangements, the two of them cut their electronic monitoring bracelets and attempted to flee the country.  Tony Houran was apprehended at Kennedy Airport about to board a flight for Amman, Jordan, the Hourans' native country.  Adam Houran remains a fugitive.  A week later, Tony Houran received the 109 months sentence of imprisonment described above.

In 2001, a new indictment was returned in the Eastern District of Pennsylvania naming 12 persons, including Tony Houran.  He was charged in four counts with participation in additional frauds totaling several million dollars which postdated the BBV case.  The new indictment concerned in part the effort of the Houran family in August, 1997, to steal an additional $2.5 million from six banks through the use of counterfeit checks, and have that money wired to Jordan, and then to flee from the United States.

Of the six banks, only PNC Bank wired funds as requested.  On August 14, 1997, it wired $185,000 to an account in Tony Houran's name in Jordan.  PNC instituted litigation in Jordan in

an attempt to recover the money.

In the second litigation, the parties entered a plea agreement.  They agreed that the guideline sentencing range would be 78-97 months.  Tony Houran would plead guilty only to the conspiracy count, and the Government would move to dismiss the remaining three substantive counts of mail fraud.  This had the effect of limiting Tony Houran's sentencing exposure to 60 months (the statutory maximum for the conspiracy charge).

Entering the plea agreement pursuant to Federal Rule of Criminal Procedure 11(e)(i)(c), the parties agreed to a specific sentence.  The agreement called for a sentence of 60 months imprisonment on the conspiracy charge, to run concurrently with the sentence imposed in the first case, with the exception that 24 months of the new sentence would run consecutively to the 109-month sentence imposed in the first case.

The agreement also included a provision requiring that Tony Houran, terminate the litigation in Jordan and return to PNC Bank the $185,000 which was stolen from it in August, 1997, as part of the counterfeit check scheme.  The agreement provided that the government would recommend a consecutive 24-month sentence only if Tony Houran cooperated and gained the return of the stolen money.  In the event that the stolen money was not returned by the time of sentencing, the government was free to recommend that more of the 60-month term run consecutively to the existing sentence.  In exchange for the government's concessions in the plea agreement, Tony Houran agreed to waive his right to appeal.

The stolen money was not returned by the time of sentencing in February 2004, and the government presented evidence that Tony Houran had participated in an effort in Jordan to make the funds even more inaccessible.  The government asserted that Tony Houran was in breach of

his plea agreement due to the failure to return the stolen money.  While the agreement then allowed the government to recommend a consecutive sentence of as long as 60 months, it tempered its recommendation and suggested that 42 months of Houran's new sentence be consecutive to the sentence in the first case.  The Court agreed and imposed the recommended sentence.

Despite his plea agreement, Tony Houran filed an appeal of the sentence.  The government moved to dismiss the appeal on the basis of Tony Houran's appellate waiver, and on January 14, 2005, the Court of Appeals granted that motion and dismissed the appeal.  See United States v. Abuhouran, 119 Fed. Appx. 402 (3d Cir. 2005) (dismissing the appeal in the second case based on appellate waiver, and rejecting Tony Houran's argument that the government breached the plea agreement).

There were further developments in July 2005, when PNC Bank's attorney in Jordan successfully obtained the $185,000 from a Jordanian court.  On the basis of that development, the government filed a motion in the District Court pursuant to Federal Rules of Criminal Procedure 35  requesting that the Court reduce Tony Houran's sentence to comport with the parties' original agreement, i.e., a term of 60 months imprisonment, with 24 months to run consecutively to the sentence imposed in the first case.  On November 22, 2005, the District Court granted the motion.

At the time the government filed its Rule 35 motion, it did so pursuant to an agreement with Tony Houran in which he once again affirmed his waiver of the right to appeal.  The new provision stated:

> 4.  The defendant acknowledges that the government is not

> required by law to file a motion under Rule 35(b) in his case
> allowing a modification of his sentence, and that rather the
> government is acting in its sole discretion to file the motion on his
> behalf.  In exchange for the government's action, the defendant
> agrees that, if the Court accepts this agreement and imposes the
> sentence stipulated above, the defendant will withdraw the pending
> petition he filed in this case pursuant to 28 U.S.C. § 2255.  <u>The
> defendant further agrees that, if the Court accepts this agreement
> and imposes the stipulated sentence, he will not file, and waives
> the right to file, in both this case and No. 95-00560-04 [the first
> case], any new appeal of or collateral attack on the defendant's
> conviction, sentence, or any other matter relating to either
> prosecution, whether such a right to appeal or collateral attack
> arises under 18 U.S.C. § 3742, 28 U.S.C. § 1291, 28 U.S.C. §
> 2255, or any other provision of law</u>.  (emphasis added)

The 109-month sentence imposed in the first case, after credit for good behavior,

terminated on August 2, 2005.  The 24-month consecutive sentence in the second case, after

credit for good behavior, terminated on April 24, 2007, and Tony Houran was released from

prison.  He then began to serve the terms of supervised release: five years in the first case, and

three years in the second case.

## II.  <u>Discussion</u>

A.  <u>Santos Decision:</u>  Both Steve Houran and Tony Houran assert that by virtue of the

Supreme Court's definition of "proceeds" for money laundering purposes as "profits" and not

"receipts," they are innocent of the money laundering charges of which they were convicted.

The facts of <u>Santos</u> are important when deciding its impact upon the instant cases.  From

the 1970s until 1994, Santos operated a lottery in Indiana that was illegal under state law.  Santos

hired helpers to run the lottery.  At bars and restaurants his runners gathered bets from gamblers,

kept a portion of the bets as their commissions, and delivered the rest to Santos's collectors.  The

collectors delivered the money to Santos, who used some of it to pay the salaries of the collectors

and to pay the winners.

The payments to the runners, collectors and winners were the basis of a 10-count indictment, naming Santos among others. A jury found Santos guilty of one count of conspiracy to run an illegal gambling business, one count of running an illegal gambling business, one count of conspiracy to launder money under 18 U.S.C. § 1956(a)(1)(A)(i) and § 1956(h), and two counts of money laundering under 18 U.S.C. § 1956(a)(1)(A)(i). The court sentenced Santos to 60 months of imprisonment on the two gambling counts and to 210 months imprisonment on the three money laundering counts. The Court of Appeals for the Seventh Circuit affirmed the convictions and sentences, and the Supreme Court declined to review.

On Santos's 28 U.S.C. § 2255 collateral attack on the money laundering convictions the District Court held that the federal money-laundering statute's prohibition of transactions involving criminal "proceeds" applies only to transactions involving criminal profits, not criminal receipts. Applying this holding to Santos's case, the district court found no evidence that the transactions on which the money laundering convictions were based (Santos's payments to runners, collectors and winners) involved profits, as opposed to receipts of the illegal lottery. The court vacated the money laundering conviction, and the Court of Appeals affirmed.

The government's appeal to the Supreme Court produced four opinions. In what will be referred to as the "plurality" opinion, Justice Scalia held that, "[b]ecause the 'profits' definition of 'proceeds' is always more defendant friendly than the 'receipts' definition, the rule of lenity dictates that it should be adopted." Santos, 128 S. Ct. at 2025.

Justice Alito, with whom Chief Justice Roberts and Justices Kennedy and Breyer joined, dissented. In their view the term "proceeds" in the money laundering statute means gross

receipts, not net income or profits.  Id. at 2036 (Alito, J., dissenting).

In an opinion concurring in the judgment resulting from Justice Scalia's opinion, Justice Stevens stated that "Congress could have provided that the term 'proceeds' shall have one meaning when referring to some specified unlawful activities and a different meaning when referring to others . . .  If Congress could have expressly defined the term 'proceeds' differently when applied to different specified unlawful activities, it seems to me that judges filling the gap in a statute with such a variety of applications may also do so, as long as they are conscientiously endeavoring to carry out the intent of Congress. . . . [T]his Court need not pick a single definition of 'proceeds' applicable to every unlawful activity, no matter how incongruous some applications may be."  Id., at 2032 (Stevens, J., concurring).  Justice Stevens concluded that "[t]he revenue generated by a gambling business that is used to pay the essential expenses of operating that business is not 'proceeds' within the meaning of the money laundering statute."  Id. at 2033 (Stevens, J., concurring).

The Court of Appeals for the Third Circuit had occasion to refer to Santos in United States v. Yusuf, 536 F.3d 178 (3d Cir. 2008).  The issue in that case was whether unpaid taxes, which were unlawfully disguised and retained by means of the filing of false tax returns through the United States mail, were "proceeds" of mail fraud for purposes of sufficiently stating a money laundering offense under the federal international money laundering statute, 18 U.S.C. § 1956(a)(2).  Mail fraud was the specified unlawful activity to support the money laundering charges against the defendants, who moved in the District Court to dismiss the substantive money laundering charges on the basis that any imposed taxes disguised and retained as a result of filing false tax returns through the mail do not equate to "proceeds" of mail fraud.  The

12

District Court agreed and dismissed the substantive money laundering counts.

On the government's appeal, the Court of Appeals summarized <u>Santos</u>. In a footnote it stated: "In view of the above discussion, we believe that <u>Santos</u> overrules this Court's decision in <u>United States v. Grasso</u>, which was relied upon by the District Court in the instant case. <u>Grasso</u>, 381 F.3d 160, 169 (3d Cir. 2004) (holding that "proceeds," as that term is used in the money laundering statute, means gross receipts [from illegal activity] rather than profits.'" <u>Yusuf</u>, 536 F.3d at 186 n. 11.

Applying <u>Santos</u>, the Court of Appeals ruled:

> . . . the mailings of the fraudulent tax returns resulted in "proceeds" of mail fraud based on the nature of the entire ongoing fraudulent scheme because the unpaid taxes unlawfully retained by defendants represented the "proceeds" of a fraud that was also furthered by previous mailings. <u>See</u> <u>Morelli</u>, 169 F.3d at 806-807. Each mailing, whether it occurred before or after a given act of tax fraud, served to promote and conceal each month's unlawful retention of taxes, either <u>ex ante</u> or <u>ex post</u>, and made it more difficult for the government to detect the entire fraudulent scheme. <u>See</u> <u>Id.</u> Moreover, each mailing of the fraudulent tax forms "contributed directly to the duping" of the Virgin Islands government, and subsequent mailings were essential to keep defendants' scheme going because it would have come to an end if the tax collecting authorities did not continue to receive these mailings. <u>See</u> <u>Schmuck</u>, 489 U.S. at 712. Accordingly, it logically follows that the unpaid taxes, unlawfully disguised and retained through the mailing of the tax forms, were "proceeds" of defendants' overall scheme to defraud the government. This scheme was both dependent on and completed by the monthly mailing of the false Virgin Islands gross receipt tax returns.
>
> Finally, in light of the Supreme Court's decision in <u>Santos</u>, we recognize that the "proceeds" from the mail fraud in this case also amount to "profits" of mail fraud. <u>See</u> 128 S. Ct. 2020, 2025, 2036. By intentionally misrepresenting the total amount of Plaza Extra Supermarkets' gross receipts through the mailing of fraudulent tax returns, the defendants were able to secretly "pocket" the 4% gross receipts taxes on the unreported amounts which were the property of

13

> the Virgin Islands government. . . .  Other than some small expenses
> incurred in perpetuating the mail fraud - i.e., the postage stamp
> affixed to their monthly tax return or any other preparation fees
> relating to the return - the unpaid taxes retained by defendants
> amounted to profits.  Once these profits were included in the lump
> sums sent abroad by defendants, the offense of international money
> laundering was complete.

Id. at 190.

In the instant case the government invites the court to take a limited view of both Santos and Yusuf and interpret the Santos holding as being limited to cases involving an illegal gambling enterprise, and nothing else.  The government notes that the plurality and dissenting opinions left the Court evenly divided between the view that "proceeds" means profits in all cases and the view that it means gross receipts in all cases.  With Justice Stevens taking the view that "proceeds" may mean profits as applied to some specified unlawful activities and gross receipts as applied to others, the meaning of Santos is unclear, and this court is free to interpret it narrowly, limiting it to cases where the predicate specified unlawful activity is a violation of 18 U.S.C. § 1955.

Further, the government argues that this court is not limited by the Court of Appeals opinion in Yusuf.  It contends that the footnote rejecting Grasso's holding that "proceeds" refers to gross receipts was only dictum, because the Court found that the case involved only profits, meeting all the requirements of the Santos plurality opinion.

The court declines the government's invitation to venture into this uncharted territory.  It concludes that the plurality opinion in Santos, as fully accepted in Yusuf, states the applicable law.  The "proceeds" of the predicate specified unlawful activity means the profits of that activity and not its gross receipts.

14

B. Profits:  In one important respect the money laundering charges against Steve and Tony Houran differ markedly from the money laundering charges in Santos and in United States v. Scialabba, 282 F.3d 475 (7th Cir. 2002), the pioneer in this series of money laundering "profits" vs. "receipts" cases.  In both of those cases the proceeds that the government charged were laundered constituted payments made as an integral part of an underlying gambling offense. In the instant Houran cases, the proceeds that the government charged were laundered did not constitute payments made as an integral part of underlying bank fraud offenses.

In Scialabba the crime of gambling was the underlying offense.  Robert Cechini, the sole proprietor, assisted by Scialabba, provided poker machines to bars, taverns and restaurants. Patrons dropped coins into the machines, receiving on-screen credits if they won.  Many of the outlets redeemed the credits for cash.  When Cechini or Scialabba opened the coin boxes the contents would be split with the outlet's owner: some went to cover the payments made to customers; some were retained by the owner as compensation for his role in the business, and Cechini and Scialabba kept the rest as compensation for supplying and repairing the machines. Although only the retained portion of the receipts might be deemed profits, the government treated the criminal receipts, i.e., the payments to the outlets' owners and for other expenses, as laundered money.

Santos involved the same situation.  The payments which were the basis of the government's money laundering charges were an integral part of the predicate offense.  As in Scialabba, the crime of gambling–a lottery–was the underlying offense.  Santos employed a number of helpers to run the lottery.  At bars and restaurants, Santos's runners gathered bets from gamblers, keeping a portion as their commissions, and delivered the rest to Santos's collectors, of

whom Diaz was one.  Diaz delivered the money to Santos, who applied it to pay the collectors'

salaries and to pay the winners, keeping the balance as his profits.  The government treated the

criminal receipts, i.e., the payments to the runners, collectors and winners as laundered money.

The Houran case presents a much more complicated fact pattern.  In Paragraphs 1 and 2

of Count One, which charges Steve Houran and Karam Salib with bank fraud, the indictment sets

forth the overall scheme that underlies all the bank fraud and money laundering counts.  In

essence, the three Houran brothers, Steve, Adam and Tony, devised a plan to utilize fraudulent

loans to strip the Bank of the Brandywine Valley ("BBV") of its assets and to use these assets for

the purposes, among others, of Steve Houran's company, Houran Construction Company

("HCC") and other businesses.  The Houran brothers were assisted in this scheme by Seth T.

Gardner, President and Chief lending officer of BBV; by the brothers' sister, Adina Houran; by

Kaseem Alavoic, an employee of Steve Houran; and by Karam Salib, a bookkeeper of HCC and

its related companies.

Paragraph 2 of Count One is typical of the bank fraud charges except that each names a

different defendant or combination of defendants.

> 2.  From in or about April 1990, to in or about February 1992, in the
> Eastern District of Pennsylvania and elsewhere, defendants
>
> HITHAM ABUHOURAN
> a/k/a "Steve Houran" and
>
> KARAM SALIB
>
> knowingly, and with intent to defraud, engaged in a scheme or artifice
> to defraud the Bank of the Brandywine Valley, and to obtain monies
> owned by and under the care, custody, and control of the Bank by

16

means of false and fraudulent pretenses.

Count One proceeded to detail the particular misrepresentations about his personal finances that Steve Houran made to BBV in order to obtain a line of credit for his personal use in the amount of $450,000.  To support a claimed net worth of $15,130,831 as of December 31, 1989 and $13,661,704 as of June 1, 1990, Steve Houran submitted to BBV, among other fraudulent papers, forged statements showing ownership of valuable real estate and false income tax returns.

Each of the bank fraud counts alleges obtaining of bank loans by one or more of the defendants by similar fraudulent means.  In summary it was alleged that:

> Between May 1990 and October 1991, defendants . . . and persons and entities controlled by them obtained over $9 million in loans and other extensions of credit from the Bank.  They did not repay these funds, causing the insolvency of the Bank which was placed in receivership by the Commonwealth of Pennsylvania on February 21, 1992.

Steve Houran was named in 15 counts of bank fraud, and Tony Houran was named in four counts of bank fraud.  Each count incorporated by reference the allegations of Paragraph 1 of Count One, set forth the particular loan or line of credit that was fraudulently obtained, and recited the fraudulent misrepresentations that were employed to obtain the loan or line of credit.

Steve Houran was charged with four counts of money laundering: Counts Eight, Eighteen, Twenty-Seven and Thirty-one.  Tony Houran was charged with one count of money laundering, specifically, Count Twenty-Seven.

Each money laundering count incorporated by reference Count One of the indictment which described the relationship of the defendants, Steve Houran's ownership and operation of

17

HCC, the obtaining of $9 million in loans and other extensions of credit from BBV, and the

resulting insolvency of BBV.  Each money laundering count contained the allegation that "[t]he

financial transaction described in Paragraph 2 involved the proceeds of a specified unlawful

activity, that is, the bank fraud, as charged in Count [Seven] [Sixteen] [Twenty-Six] [Twenty-

Nine] of this Indictment, and the defendants acted with the intent to promote the carrying on of

the specified unlawful activity."  As an example, Count Eight reads in its entirety:

<u>COUNT EIGHT</u>

(Money Laundering Adham Abuhouran
and Nasser Plaza Lines of Credit)

THE GRAND JURY FURTHER CHARGES THAT:

1.  Paragraph 1 of Count One of this Indictment, and Paragraph 3 of
Count Seven of this Indictment, are incorporated here by reference.

2.  On or about December 6, 1990, in the Eastern District of
Pennsylvania and elsewhere, defendants

HITHAM ABUHOURAN,
a/k/a "Steve Houran" and

ADHAM ABUHOURAN,
a/k/a "Adam Houran"

knowingly conducted and did knowingly aid, abet, and cause the
conducting of the following financial transaction affecting interstate
commerce: Defendant ADHAM ABUHOURAN, a/k/a "Adam
Houran" wrote a check, number 1007, on the account of Adham and
Manal Abuhouran, number 8221204434, at First Fidelity Bank,
Union City, New Jersey, payable to "Houran Const. Inc.," in the
amount of $100,000, which was deposited by the defendants in the
account of Houran Construction Company at the Bank of the
Brandywine Valley, number 5002555.

3.  When conducting and aiding, abetting, and causing the conducting
of this financial transaction, the defendants knew that the property

18

involved in the financial transaction represented the proceeds of some form of unlawful activity.

4.  The financial transaction described in Paragraph 2 involved the proceeds of a specified unlawful activity, that is, bank fraud, as charged in Count Seven of this Indictment, and the defendants acted with the intent to promote the carrying on of the specified unlawful activity.

In violation of Title 18, United States Code, Sections 1956(a)(1)(A)(I) and 2.

There is a significant difference between the use of allegedly money laundered proceeds in the Santos and Scialabba cases and the Houran case.  In the former the so-called money laundered funds were expended as a part of the commission of the underlying offense.  Payment of the tavern owners, runners, collectors and winners was a part of the gambling operations.  On the other hand, the payments constituting the Houran money laundering offenses were not part of the underlying bank fraud.  The bank fraud consisted of presenting the bank with forged or counterfeit documents and making false representations.  The crime was complete when, in reliance, BBV turned over the money to the particular defendant.  The money laundering was something separate and apart from the bank fraud and took place after the bank fraud offense had been completed.

The government argues that the proceeds of each bank fraud constituted profits, and consequently each charged money laundering transaction involved the proceeds, i.e., profits, of a specified unlawful activity.  Thus, according to the government, the requirements of Santos are met.

Petitioners, however, seek to overcome this clear distinction between the Santos facts and the facts of the instant case, relying on what Justice Scalia refers to as the "merger problem."  In

19

essence, Petitioners' argument is that the overarching offense in this case was bank fraud designed to enable the Hourans to carry on their construction business, that the alleged individual money laundering transactions were payments in pursuit of that business, and that because the construction business lost money, there were no profits to support money laundering charges.

Justice Scalia wrote:

> If "proceeds" meant "receipts," nearly every violation of the illegal-lottery statute would also be a violation of the money-laundering statute, because paying a winning bettor is a transaction involving receipts that the defendant intends to promote the carrying on of the lottery. Since few lotteries, if any, will not pay their winners, the statute criminalizing illegal lotteries, 18 U.S.C. § 1955, would "merge" with the money laundering statute. Congress evidently decided that lottery operators ordinarily deserve up to 5 years imprisonment, § 1955(a), but as a result of merger they would face an additional 20 years, § 1956(a)(1). Prosecutors, of course, would acquire the discretion to charge the lesser lottery offense, the greater money-laundering offense, or both-which would predictably be used to induce a plea bargain to the lesser charge.

Santos, 128 S. Ct. at 2026.

In Scialabba the Seventh Circuit raised the same concern:

> According to the prosecutor Cechini and Scialabba violated § 1956(a)(1) when they handed some of the money in the coin boxes over to the outlets' owners and used more of that revenue to meet the expenses of the business (such as leasing the video poker machines and obtaining amusement licenses for them from the State). This is equivalent to saying that every drug dealer commits money laundering by using the receipts from sales to purchase more stock in trade, that a bank robber commits money laundering by using part of the loot from one heist to rent a getaway car for the next, and so on. An embezzler who spent part of the take on food and rent, in order to stay alive to cook the books again, would be a money launderer too. Yet none of these transactions entails financial transactions to hide or invest profits in order to evade detection, the normal understanding of money laundering.

20

282 F.3d at 476.

Both <u>Santos</u> and <u>Scialabba</u> concerned gambling offenses.  However, each emphasizes that the merger problem is not limited to such offenses.  Justice Scalia stated that "[f]or a host of predicate crimes, merger would depend on the manner and timing of payment for expenses associated with the commission of the crime."  <u>Santos</u>, 128 S. Ct. at 2026.  Of particular relevance to the present petitions is Justice Scalia's observation that "[g]enerally speaking, any specified unlawful activity, an episode of which includes transactions which are not elements of the offense and in which a participant passes receipts on to someone else, would merge with money laundering."  <u>Id.</u>

The circumstances addressed in <u>Yusuf,</u> cast some light upon the merger problem.  The defendants were United Corporation, which operated three supermarkets, and six of its principals.  United was required to report monthly to the Virgin Island authorities its gross receipts and pay taxes on them.  An FBI investigation revealed that the defendants had conspired to avoid reporting $60 million of the supermarkets' gross receipts on United Virgin Islands gross receipts monthly tax returns and failed to pay the Virgin Islands government the 4% tax owed on those gross receipts.  Defendants engaged in various efforts to disguise and conceal the illegal scheme and its proceeds, including depositing these monies into bank accounts controlled by them outside of the United States.  With the unreported cash defendants purchased, and instructed others to purchase, cashier's checks, traveler's checks and money orders from different banks and made payable to outside parties in order to disguise the cash as legitimate financial instruments and to evade federal record-keeping mandates.

A grand jury returned a 78-count indictment charging mail fraud, tax evasion and

international money laundering.  Counts 3-43 charged forty mail fraud offenses in violation of 18

U.S.C. § 1341.  Counts 44-52 charged nine international money laundering offenses in violation

of 18 U.S.C. § 1956(a)(2)(B)(i).  Each money laundering count alleged that mail fraud was the

predicate offense or "specified unlawful activity" to support the related money laundering charge.

The defendants moved to dismiss the money laundering charges on the ground that any

unpaid taxes disguised and retained as a result of filing false tax returns through the United States

mail did not equate to "proceeds" of mail fraud and, accordingly, Counts 44 through 52 failed to

state an offense.  The District Court granted the motion, holding that a tax savings resulting from

filing false tax returns does not "represent the proceeds of some form of unlawful activity."  See

Yusuf, 536 F.3d at 183 (quoting 18 U.S.C. § 1956(a)(2)(B)).  Rather, they represented a

percentage of gross receipts that were lawfully obtained in the day to day business of the

supermarkets.  See Id. at 183-84.

The Court of Appeals rejected the District Court's view that funds originally procured

through lawful activity can be classified only as proceeds of that lawful activity and cannot

thereafter be converted into a proceeds of a specified unlawful activity, holding that "simply

because funds are originally procured through lawful activity does not mean that one cannot

thereafter convert those same funds into the 'proceeds' of an unlawful activity."  Id. at 185.

(emphasis in original).

The precise holding of Yusuf, that funds originally procured through lawful activity can

become "proceeds" of an unlawful activity, does not advance the resolution of the instant case.

However, Yusuf illustrates money laundering in its pure, unambiguous form and provides a

model against which the instant case can be examined.

22

Yusuf is readily distinguishable from Santos and Scialabba.  In the latter two cases the proceeds involved in the money laundering transactions were paid out in the course of the commission of the predicate offense and reduced the defendants' take.  In Yusuf, the proceeds involved in the money laundering were the fruits of a completed predicate offense and were paid out "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of" the predicate offense.  See Id. at 185 (quoting 18 U.S.C. § 1956(a)(2)(B)(i)). The Court of Appeals acknowledged the distinction between the Santos circumstances and the circumstances attending the Yusuf prosecution:

> Furthermore, the Supreme Court, in United States v. Santos, recently clarified that the term "proceeds," as that term is used in the federal money laundering statute, applies to criminal profits, not criminal receipts, derived from a specified unlawful activity.  In Santos, the defendants were convicted of violating 18 U.S.C. § 1956(a)(1)(A)(i) - the subsection of the federal money laundering statute that criminalizes financial transactions using the proceeds of a specified unlawful activity with the intent to promote the carrying on of such activity.  The Supreme Court affirmed the trial court's decision to vacate the money laundering convictions because the transactions on which such convictions were based involved the gross receipts, as opposed to the profits, of the specified unlawful activity, the operation of an illegal lottery.  The Supreme Court reasoned that the transactions upon which the money laundering charges were based could not be considered to have involved "proceeds" of the illegal lottery's operation because such transactions involved the mere payment of the illegal operation's expenses rather than the operation's profits.

Id. at 185-6 (citations omitted).  Unlike in Santos and Scialabba, the merger question was not an issue in Yusuf.

Petitioners contend that the present case adds a new dimension.  The defendants took millions of dollars in fraudulent loans.  The predicate for each money laundering charge was a

23

specific bank fraud, the proceeds of which were obtained at no material expense to any of the

defendants.  The money laundering count relying on each of these predicate offense charges that

the charged transaction "involved the proceeds of a specified unlawful activity, that is, bank

fraud, as charged in Count [      ] of this indictment and the defendants acted with the intent to

promote the carrying on of the specified unlawful activity."  Because the entire proceeds were

profits, the government argues, Santos is inapplicable.  But the Hourans pick up on the final

phase of each money laundering count to the effect that "the defendants acted with intent to

promote the carrying on of the specified unlawful activity."  The unlawful activity, they contend,

was not each incident of bank fraud.  Rather, it was their entire construction business which the

defendants in the case carried on and financed with their continuing program to loot BBV.  As

Paragraph 3(f) of Count 7 of the Indictment stated, the purpose of the overall scheme "was to

obtain funds of the Bank and apply them to the personal use of the defendants and companies

they controlled."  Similar language appeared throughout the Indictment.

The process that took place in this case, the Hourans argue, raises the merger problem

that Justice Scalia described in Santos: "And any wealth-acquiring crime with multiple

participants would become money laundering when the initial recipient of the wealth gives his

confederates their shares.  Generally speaking, any specified unlawful activity, an episode of

which includes transactions which are not elements of the offense and in which a participant

passes receipts on to someone else, would merge with money laundering."  Santos, 128 S. Ct. at

2026-27.[1]

_____

[1]  At the hearing on their petitions Petitioners argued that they should at least be
resentenced because the relevant conduct that the court relied upon for sentencing purposes
included losses attributable to the Count Fifty-four conspiracy to commit money laundering

In theory the Santos, Scialabba, Yusuf and the instant case present three money laundering scenarios.  First, there is pure money laundering, exemplified by Yusuf, in which the specified unlawful activity is carried out independently of the money laundering transactions.  Second, there is what the court will refer to as "false money laundering," exemplified by Santos and Scialabba, in which the alleged money laundering transaction is a part and parcel of the specified unlawful activity.  Third, there is the merger case, which Petitioners argue is exemplified by the present case, in which even though the specified unlawful activity is carried out independently of the money laundering transaction, the two are so interrelated the alleged money laundering payments cannot be deemed profits.  It is necessary to determine if Justice Scalia's merger language is applicable in this case and, if so, whether a majority (as distinguished from a plurality) of the Supreme Court would adhere to it.

Among the first 34 counts of the indictment there were 14 counts charging bank fraud in violation of 18 U.S.C. §1344.  With respect to four of these bank fraud charges, there were related charges alleging that the proceeds of these frauds were laundered in violation of 18 U.S.C. § 1956.  It was stated that Steve Houran and Tony Houran transferred the fraudulently obtained funds among multiple accounts in order to move the funds to the Hourans' enterprises and prevent the bank from recovering the money.  The related fraud and money laundering counts were as follows:

---

offense in addition to the losses arising from the substantive money laundering counts.  In Steve Horan's case this totalled $4,729,812.15, of which $2,527,812.15 was attributable to the Count Fifty-four offense.  Petitioners contend that this was not all profits and therefore was an improper basis for sentencing.  Sentencing issues either were or should have been resolved on appeal or during § 2255 proceedings.  They are not a part of this proceeding, which is directed solely to the issue whether Petitioners' convictions are void in light of Santos.  Therefore, the Court will not address Petitioners' arguments regarding the propriety of their sentences.

Count 7, Bank Fraud: Steve Houran and Adam Houran obtained from BBV by means of false and fraudulent pretenses a line of credit for the use of Adam Houran in the amount of $250,000 and a related loan to Nasser Plaza, Inc. in the amount of $350,000.

Count 8, Money Laundering: Steve Houran and Adam Houran caused Adam Houran to write a check on an account of Adam and Manal Houran payable to Houran Const. Inc., in the amount of $100,000, knowing that the money represented proceeds of the bank fraud charged in Count 7.

Count 16, Bank Fraud: Steve Houran and Tony Houran obtained from BBV by means of false and fraudulent pretenses a line of credit for the use of Houran Plaza Associates in the amount of $350,000.

Count 18, Money Laundering: Steve Houran and Adam Houran caused Adam Houran to write a check on an account of Adam and Manal Houran payable to Houran Const. Co., Inc. in the amount of $50,000, knowing that the money represented proceeds of the bank fraud charged in Count 16.

Count 26, Bank Fraud: Steve Houran, Adam Houran, Tony Houran, Adma Houran and Karam Salib by means of false and fraudulent pretenses obtained loans from BBV to 13 borrowers for the acquisition of lots on Webster Avenue, Kennedy Blvd., and Pamrapo Avenue in Jersey City, New Jersey, and for the construction of houses on those lots.

Count 27, Money Laundering: Steve Houran, Adam Houran and Tony Houran caused Adam Houran and Tony Houran to write a check on an account of Petra Construction Company payable to Raymond E. Murphy, Jr., Esq. Trust Account in the amount of $100,000 knowing that the money represented proceeds of the bank fraud charged in Count 26.

Count 29, Bank Fraud: Steve Houran, Adma Houran, and Karam Salib by means of false and fraudulent pretenses obtained from BBV related lines of credit, one for Adma Houran in the amount of $200,000 and one for her wholly owned company, U.S.A. Trading Company, Inc., in the amount of $75,000.

Count 31, Money Laundering: Steve Houran and Adma Houran caused Adma Houran to write a check on the account of Capital

Mortgage Corp. payable to Steve Houran in the amount of $75,000 which was deposited by Steve Houran in an account of Houran Construction Company, knowing that the money represented proceeds of the bank fraud charged in Count 29.

Steve and Adam Houran assert that in light of Santos's definition of proceeds as profits and not receipts, they are innocent of the crime of money laundering. They contend that the transactions listed in Counts 8, 18, 27 and 31 were not net profits; rather, they were deposits for work on projects and new homes to be built. In Steven Houran's words, contained in a July 25, 2008 Declaration:

> That every transaction was made with every loan easely (sic) tracable to its ownership and source.
>
> That every transaction is supported by the company's records for business expenses and cost to build.
>
> That the transaction in count 27 payment of $100,000 to Attorney's trust account "Raymond E. Murphy" was not for my personal use rather it was for payment on secured credit line from EXT BANK in NY to the Houran Construction Company. The loan was secured by my residence in Old Tappan.
>
> That the transaction in Count 8, was not net profit of any kind rather it was payment to Houran Construction for the asbestos removals and repairs it did on Nasser Plaza.
>
> That the transactions deposited from "Adham Abuhouran" in count 8, were the excess amount browed (sic) from the bank for the purpose of repairs and coversion (sic) with the township of North Bergen.
>
> That the amount of work was placed in the "Goodman Building" or the "Nasser Plaza" went ubove (sic) and beyond the total amount browed (sic) from the bank.
>
> That the reason for delays in receiving approvals from the township was zoning problem and third party interest to see the building fail.
>
> That the cost of plans and repairs that went into the building evidence

by the company record and closing statements the attorneys prepaired. (sic).

That the transaction in count 27 and the added amount all went to the building of the new homes, land purchases and carrying cost in addition to insurance, taxes and title fees.

That the transaction in count 31 was loan I asked my sister to give until bonding is replaced and municipalities will resume making payments on my work.

That the Bankruptcy of my bonding company was major factor in shutting down all receivables from municipal jobs Houran Construction was engaged in at that time.

That the list of project attached herein this motion is true and correct, and verifiable by the records within the government position (sic).

The list of projects to which Steve Houran referred in his Declaration read as follows:

LIST OF PROJECTS HOURAN CONSTRUCTION WAS WORKING ON
DURING THE PERIOD OF 1989-1993

| | | |
|---|---|---|
| 1. | New Brunswick Public Law Library | $1,000,000 |
| 2. | New Brunswick Public Work Garage | $1,300,000 |
| 3. | Old Bridge Public Library | $2,500,000 |
| 4. | West New York Housing Authority | $500,000 |
| 5. | West New York Detective Department | $100,000 |
| 6. | Union City Day Care Center | $1,500,000 |
| 7. | West New York Recreation Center | $1,600,000 |
| 8. | R. Moody, Esq. Office Renovation | $175,000 |
| 9. | U.S. Postal Services in NJ | $60,000 |
| 10. | David Chang, J.C. Office Renovation | $300,000 |
| 11. | Dr. Vino Patel one family house build in Jersey City | $165,000 |
| 12. | Ms. Marina Cromos, New Home in West Orange, NJ | $325,000 |

| 13. White Castle restaurant in North Bergen | $140,000 |
| 14. Nazzer Plaza Building repairs | $200,000 |
| 15. Houran Plaza 32 units apartment building | $750,000 |
| 16. Other miscellaneous jobs value under $25,000 | |

Petitioners seek to persuade the court that none of the money laundering offenses with which they were charged involved profits. They argue that they used all of the money loaned by BBV to further projects of HCC and its affiliates, and that, because HCC continually lost money, the frauds did not result in any profit that would form a basis for a money laundering charge. Like the lottery operation in <u>Santos</u>, where the bets were used to pay Santos's expenses, they argue, the proceeds of the loans were used to pay the expenses of the business.

There is a world of difference between the <u>Santos</u> situation and the situation here. In <u>Santos,</u> paying the runners, the collectors, and the bet winners was all part of the specified unlawful activity. Here, when the Hourans through their manifold fraudulent acts, secured each loan, the specified unlawful activity, bank fraud, was completed. Whatever was done with the proceeds of each loan was the start of a new activity, a separate crime if done with the requisite intent. The proceeds of each fraudulent loan was profit derived from the illegal scheme to strip BBV of its assets through 33 fraudulently obtained loans from BBV on behalf of numerous entities and straw borrowers totaling more than $6.5 million.

It is true that the four money laundering counts were parts of an overall scheme. Count Eight rested on the bank fraud charged in Count Seven. Count Seven alleged that Steve Houran and others engaged in the scheme to defraud BBV to obtain loans in December 1990 totaling $600,000 in the names of Steve Houran's brother, Adam, and a fictitious entity they controlled,

Nazzer Plaza, Inc., by submitting false information to BBV.  It is unnecessary to detail the false

information other than to note that Steve Houran needed the $600,000 to purchase a building

from the Goodman family.  After making payments on account of the Goodman building, a

balance of more than $175,000 remained, which was deposited in Adam Houran's personal bank

account.  Adam spent that money in part by giving $100,000 to HCC, purportedly as a loan, and

$50,000 to Steve Houran's liquor store.  The $100,000 was part of the laundered profit that the

Houran's derived from the fraudulent representation to BBV.  The asserted purpose of the

fraudulent Count 18 loan to Houran Plaza, Inc. of $350,000 was to renovate a 35-unit building.

The building had already been renovated.  Adam Houran received two checks from the Houran

Plaza account totaling $127,000 and put them in his own account.  A month later, in June 1991,

he wrote three checks to himself and his wife from the account totaling $130,000 and deposited

them in an account at National Community Bank.  The funds remained there until September

1991, when Adam Houran gave another $150,000 to HCC to complete the laundering.  The

additional money comprised the remaining funds that Adam Houran had from the Nazzer Plaza

loan charged in Count 7.  HCC had no entitlement to the stolen money, and it was all a part of

the $350,000 profit of the bank fraud scheme charged in Count 16.

　　　　The asserted purpose of the bank fraud Count 26 loans was the acquisition of lots on

Webster Avenue, Kennedy Boulevard and Pamrapo Avenue in Jersey City and for the

construction of houses on those lots.  The scheme involved 14 loans made by BBV to 13 dummy

borrowers in July and August, 1991, totaling $2,475,000.  It is unnecessary to recite the

convoluted chain of payments made from each fraudulent loan.  Suffice it to note that although

some payments went into the construction project, other payments were diverted to other

purposes.  These payments are traced in summary exhibits presented to the jury in the 1996 trial

of Adam and Tony Houran.  The $100,000 check payable to the Raymond E. Murphy, Esq. Trust

Account was among these payments and is the subject of money laundering Count 27.  It was

used to pay a portion of a settlement of a large mortgage on the estate where all of the Hourans

lived with their families, allowing them to remain in their house.

The purported purpose of the Count 29 bank fraud loan in the total amount of $275,000

was to provide Adma Houran with equity capital for her company, U.S.A. Trading in order to

further its business of shipping food to Jordan for ultimate delivery in Iraq.  Adma Houran

transferred $240,000 to a Bank of New York account in the name of Capital Mortgage Corp. of

the U.S.  On March 3, 1992, she wrote a check on this account for $75,000 payable to Steve

Houran which was deposited in the account of HCC at United Jersey Bank.  This is the subject of

the money laundering charge in Count 31.

The Court accepts the plurality opinion in Santos as a statement of the law, as of the date

the offenses were committed, namely, that "proceeds" as used in the money laundering statute

means "profits" and not "receipts."[2]  Given that definition, the present case is at the opposite pole

from Santos.  Santos concerned the predicate offense of gambling, an offense which, in order to

commit it, required the payment of runners, collectors and winners as part of a combined

operation.  The present case concerns the predicate offense of bank fraud, an offense which is

completed after the fraudulent conduct has induced the victim bank to pay out the money. The de

---

[2]  Effective May 20, 2009, the money laundering statute was amended to include, a
provision that "(9) the term 'proceeds' means any property derived from or obtained or retained
directly or indirectly, through some form of unlawful activity, including the gross receipts of such
activity."  See 18 U.S.C. § 1956(c)(9).

minimis expenses of assembling fraudulent documents and transporting oneself to and from the bank can be ignored.  There are no expenses inherent in the crime of bank fraud, as there are in running a gambling operation.  Consequently, all the payments derived from the fraud are profits to the perpetrators and thus are proceeds for the purpose of Section 1956(a)(1).

Petitioners contend that notwithstanding that the money laundering payments were not a part of the predicate bank fraud, the "merger" concept prevents them from being treated as proceeds of the bank fraud.  A fair reading of Justice Scalia's plurality opinion leads to the conclusion that merger does not prevent the laundered moneys in this case from being deemed profits of the bank fraud.

Justice Scalia first addressed the fact situation that exists in the gambling or lottery cases:

> If "proceeds" meant "receipts" nearly every violation of the illegal-lottery statute would also be a violation of the money-laundering statute, because paying a winning better is a transaction involving receipts that the defendant intends to promote the carrying on of the lottery.  Since few lotteries, if any, will not pay their winners, the statute criminalizing illegal lotteries, 18 U.S.C. § 1955, would "merge" with the money-laundering statute.

Santos, 128 S. Ct. at 2026.

Unlike paying a lottery winner, the money laundering payments in the instant case, e.g., payments to HCC, Raymond E. Murphy, Jr., Esq. Trust, and Capital Mortgage Corp., were not intended or necessary to promote the commission of the predicate offense, bank fraud in this case.  Justice Scalia's first merger example is inapplicable.

Justice Scalia notes that the merger problem "is not limited to lottery operators," and that "merger would depend on the manner and timing of payment for the expenses associated with the commission of the crime."  Id.  His commentary can reasonably be interpreted to mean that

32

payments made that enable participants in a predicate offense to carry out and complete the offense are not to be considered profits, and thus not proceeds of the predicate offense.

> Few crimes are entirely free of cost, and costs are not always paid in advance. Anyone who pays for the costs of a crime with its proceeds — for example, the felon who uses the stolen money to pay for the rented getaway car would violate the money laundering statutes. And any wealth acquiring crime with multiple participants would become money laundering when the initial recipient of the wealth gives his confederates their shares. Generally speaking, any specified unlawful activity, an episode of which includes transactions which are not elements of the offense and in which a participant posses receipts on to someone else would merge with money laundering.

Id. at 2027-26.

Petitioners do not come within this merger scenario. They and others were charged with a series of bank frauds. Although each was complete within itself, each was carried out, and its proceeds disposed of in contemplation of future similar frauds. In the case of Tony Houran the jury could readily find, and in the case of Steve Houran he could truthfully plead, that the proceeds were expended with the intent to promote the carrying on of specified unlawful activity or to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of specified unlawful activity. However, these payments were not "costs of a crime" — the crime of bank fraud. They were simply payments disposing of the fruits of the crime.

Petitioners seek to bring themselves within the merger concept by constructing a different scenario from the one the indictment projects. The indictment charges as the specified unlawful activity a series of bank frauds. Petitioners postulate a unified scheme that must be viewed in its entirety to determine if there were profits that could constitute money laundering proceeds. As Tony Houran states in his Brief:

33

> The entire scheme [Tony Houran] was convicted of was meant to obtain funds from banks to help the various construction companies pay off debt and complete projects whenever possible. Some of the debt that was paid off was previously existing mortgages on homes which was also being used to keep the construction companies afloat. In fact, the government's protestations on pages 6-7 of the Leaken letter reinforces the whole argument that the goal of the entire enterprise—illegal as it was—was to support its construction projects building public projects and homes in order to make real and legal profit.

Tony Houran argues that "[t]he Hourans' scheme was designed to keep their construction company going just like Santos tried to keep his gambling operations afloat. In order to do so there were significant expenses." Id. The differences between the two situations should be obvious. In Santos, paying the runners, collectors and winners was part of the predicate illegal lottery offense— thus the merger. In the Hourans case the payments to Houran Construction Company, Raymond E. Murphy, Jr., Esq. Trust, and Capital Mortgage Corp. were not part of the predicate bank frauds or a cost of the bank frauds—thus no merger. A merger cannot be created by redefining the specified unlawful activity as one overarching fraud on the bank, the profitability of which must be evaluated to determine if there are proceeds that can be laundered.

Petitioners protest that failing to find a merger would permit the prosecutors to charge innumerable counts of money laundering based on the profits derived from each instance of bank fraud. However, this is the situation Congress created in adopting the money laundering statute. It is not uncommon for the perpetrator of a specified unlawful activity to disposed of its proceeds by means of numerous devices. If done with the requisite intent, each disposition can be the basis of a money laundering charge. It is left to the discretion of the prosecutor to decide how many counts to charge. Yusuf is an example. There the seven defendants and others at their

direction purchased numerous cashier's checks, traveler's checks, and money orders to disguise the proceeds of the specified unlawful activity.  The indictment charged forty mail fraud offenses, each of which probably could have provided a basis for one or more money laundering counts, but the United States Attorney elected to charge only nine counts of international money laundering.

Two kinds of federal money laundering should be considered when applying <u>Santos</u>: that committed "with the intent to promote the carrying on of specified unlawful activity," 18 U.S.C. § 1956(a)(1)(A)(i), and that committed "knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."  18 U.S.C. § 1956(a)(2)(B)(i).  The money laundering crimes charged in this case are § 1956(a)(1)(A)(i) offenses.

If Petitioners' expansive reading of <u>Santos</u> were adopted, it would be difficult, if not impossible, to prosecute a § 1956(a)(1)(A)(i) case.  Petitioners contend that under the merger concept the proceeds, i.e. profits, must be those, not of the charged specified unlawful activity, but, rather, the profits of the entire criminal enterprise of the conspirators.  In this case, that would be the profits not of the particular bank fraud which was the charged specified unlawful activity, but, rather, the profits of the construction business which was the beneficiary of the defendants' bank frauds.  To determine those profits an audit would have to be conducted as of the date of each charged money laundering transaction.

An indictment charging bank fraud or mail fraud may contain many individual counts of bank fraud or mail fraud, each of which may be to derive funds for one or more objectives of the participants.  It cannot be the intent of the <u>Santos</u> plurality opinion to require that in order to

35

prosecute a § 1956(a)(1)(A)(i) money laundering charge in conjunction with the bank fraud or mail fraud charges the government must prove the profitability of the projects in which the defendants proposed to use their ill-gotten gains.

The plurality opinion itself rejects the broad construction Petitioners would give to it.  It limits the expenses that may not be considered profits to those that "normally occur during the course of running [the specified unlawful activity.]"  Id. at 2027.  The merger example given in the opinion illustrates the point - "the felon who uses the stolen money to pay for the rented getaway car."  Id. at 2026.  As the opinion states:

> The "proceeds of specified unlawful activity" are the proceeds from the conduct sufficient to prove <u>one</u> predicate offense.  Thus, to establish the proceeds element under the "profits" interpretation, the prosecution needs to show only that a single instance of specified unlawful activity was profitable and gave rise to the money involved in a charged transaction.  And the government, of course, can select the instances for which the profitability is clearest.  Contrary to the principal dissent's view <u>post</u>, at 2038, 2040-2041, <u>the fact finder will not need to consider gains, expenses, and losses attributable to other instances of specified unlawful activity, which goes to the profitability of some entire criminal enterprise.  What counts is whether the receipts from the charged unlawful act exceed the costs fairly attributable to it.</u>

(emphasis added).  Id. at 2029.

In light of the foregoing, the proceeds of the bank frauds were profits and a proper basis for the money laundering charges on which Steve Houran and Tony Houran were convicted. This conclusion is not affected by the merger concept discussed in <u>Santos</u>.

C.  <u>Tony Houran Waiver</u>: As described above, after a six-week trial, Tony Houran was convicted of, among other crimes, one count of money laundering in violation of 18 U.S.C. § 1956.  His conviction and sentence of 109 months imprisonment were affirmed on appeal.  Also

described above are the events resulting in a new indictment, plea agreement, and sentence. Tony Houran served his sentences on the two convictions and is presently on supervised release.

Like Steve Houran, upon issuance of the Santos opinion, Tony Houran filed a petition under 28 U.S.C. § 2241, asserting that he is innocent of the money laundering charge of which he and Steve Houran were convicted, the charge contained in Count 27 of the Indictment.[3]   The predicate offense for the Count 27 money laundering account was the bank fraud charged in Count 26, in which Steve Houran was also named as a defendant.

The reasons why Santos does not render invalid the Count 27 money laundering conviction are set forth above.  The government also advanced Tony Houran's waiver of his right to bring this petition as a ground to dismiss it.  It is unnecessary to decide the waiver question on the merits, but in the event that there are future proceedings in this case, the court will address the status of the waiver issue.

When the PNC Bank gained recovery in 2005 in Jordan of the $185,000 stolen from it in 1997, the government agreed to file a motion under Federal Rules of Civil Procedure 35(b) to permit the Court to reduce Tony Houran's sentence in the second case. The government had no obligation to do so, and, in fact, in light of Tony Houran's continuing fraudulent conduct over the years, it was a remarkably generous gesture on the government's part.  Nevertheless, the parties agreed that the consecutive term should be reduced from 42 months to 24 months, permitting Tony Houran to be released from prison one and a half years early.  The quid pro quo for this

---

[3]  Even though Tony Houran has been released from prison, he may bring the § 2241 petition because he continues to serve a term of supervised release.  Because he has previously filed a § 2255 petition and has no other means of presenting the Santos issue, he may proceed by way of § 2241 in this District where he is being supervised.  See In re Dorsainvil, 119 F.3d 245, 251 (3d Cir. 1997).

benefit was Tony Houran's agreement to end litigation in both criminal cases. The agreement provides:

> The defendant further agrees that, if the Court accepts this agreement and imposes the stipulated sentence, he will not file, and waives the right to file, in both this case and No. 95-00560-04, any new appeal of or collateral attack on the defendant's conviction, sentence, or any other matter relating to either prosecution, whether such a right to appeal or collateral attack arises under 18 U.S.C. § 3742, 28 U.S.C. § 1291, 28 U.S.C. § 2255, or any other provision of law.

The waiver, by its terms, applies to the first case (No. 95-00560-04).  The government contends that it should be enforced and the Petition dismissed as a violation of the waiver agreement.  See United States v. Khattak, 273 F.3d 557, 562 (3d Cir. 2001) ("[W]aivers of appeals, if entered into knowingly and voluntarily, are valid.").

Tony Houran contends that the waiver agreement is invalid as there was no meeting of the minds between himself and the government or, in fact, between himself and the attorney representing him at the time.  He presents his version of the circumstances of the execution of the agreement that contained the waiver in a declaration in support of his petition.

The earlier March, 2003 plea agreement in Case No. 00629-03 had contained a waiver of the right to appeal or file a collateral attach in that case, but it reserved Tony Houran's right to pursue post-conviction remedies in Case No. 95-00560.  In 2005, or after a Jordanian court awarded the PNC Bank the $185,000, the government agreed with Tony Houran's counsel, Jerry S. Goldman, Esq., to modify the second sentence of consecutive time to 24 months through a Rule 35(b) motion.  The government and Mr. Goldman negotiated the agreement in question that contained the waiver provision.

Tony Houran had undergone spinal surgery at the University of Massachusetts Medical

Center on October 14, 2005, remaining there until October 16. He returned to the clinic for a

follow-up visit on October 17 and was prescribed Percocet for continuing neck pain and was

moved to the Long Term Care Unit of the Devens FMC, where he stayed until November 4,

2005. His attorney, Mr. Goldman, visited him there while Tony Houran was wearing a neck

brace, was confined to a wheelchair, and was still on a regimen of painkillers, including Percocet

and Tylenol #3 with codeine for pain. According to Tony Houran:

> 8. During our meeting, Mr. Goldman told me prosecutors had contacted him and told him they wanted to deduct 18 months from my sentence by making a Rule 35 motion because money had been returned from Jordan. He showed me a proposed Rule 35 Agreement.

> 9. I specifically recall not only being in pain, but becoming anxious and having difficulty understanding what Mr. Goldman was telling me. At one point I looked at the waiver provision at Paragraph 4 of the Rule 35(B) Agreement and asked Mr. Goldman whether this affects my rights in my original case because if it did it would not sign it. At the time, I was still contemplating filing new actions over my original sentence of 109 months and had a § 2241 suit filed regarding the Bureau of Prisons' calculation of my remaining time.

> 10. Mr. Goldman assured me specifically that the appellate waiver applied only to the second case and that I would not be waiving any rights with regard to the first case. We never discussed any possibility that if there were a positive change in the law as to the offenses of which I was convicted, as there have been in regard to money laundering as a result of U.S. v. Santos. I would then be unable to seek appropriate relief.

> 11. I ultimately signed the Rule 35 Agreement, largely based on Mr. Goldman's assurances that I had a right to continue to file collateral attacks on my sentence in the older case. I do not recall any discussion with Mr. Goldman regarding the government seeking to trade an end to his filing of lawsuits in the original case in exchange for agreeing to extend the appellate waiver over that case. I would never have signed such an agreement, which would have given me what I was supposed to have originally received in the 2003 Plea Agreement (a 24-month consecutive sentence) but which would have

> also precluded me from continuing my appeals as I was permitted to
> do by that same plea bargain.
>
> …
>
> 13.  Mr. Goldman sent me a copy of the agreement several weeks
> after it was approved by the Court.  I did [do not]  recall examining
> the appellate waiver provision again until I received the opposition
> brief from the government in this matter a few months ago.

In order to rule on Tony Houran's contention that his waiver of the right to bring his petition pursuant to § 2241 was neither knowing nor voluntary, an evidentiary hearing would be required.  Credibility is an issue, and Mr. Goldman's testimony would be essential.  However, in view of the determination that Tony Houran's substantive claim lacks merit, the waiver issue need not be resolved.

### III.  <u>Conclusion</u>

For the reasons set forth above, the § 2241 petition of Steve Houran in Case No. 08-4379 and the § 2241 petition of Tony Houran in Case No. 08-4838 will be dismissed with prejudice. The court will enter an appropriate order.

*s/ Dickinson R. Debevoise*
DICKINSON R. DEBEVOISE, U.S.S.D.J

Dated: July 20, 2009